DOWD, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | CASE NO. 4:07 CR 473 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM OPINION AND |
| | ) | ORDER |
| Russell I. Porter, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

I.  Introduction

The defendant, Russell Porter, entered conditional pleas of guilty to intentionally possessing with intent to distribute 55.9 grams of crack cocaine and intentionally possessing with intent to distribute approximately 125 grams of cocaine.

He was sentenced to a term of imprisonment for 240 months (Doc. 52) and appealed the Court's denial of his motion to suppress the crack cocaine and cocaine seized from his person following a traffic stop in the City of Warren, Ohio on the afternoon of May 23, 2007.  (Doc. 54).

The Sixth Circuit reversed the conviction and remanded to this Court the issue of whether the detectives who arrested the defendant had reasonable suspicion that he was armed and dangerous in light of the 2009 Supreme Court decision in *Arizona v. Johnson*, 129 S.Ct. 781, 784 (2009).

The Sixth Circuit's opinion remanding this case summarized the factual setting for this case as follows:

(4:07 CR 473)

Warren Police Department Narcotics Unit detectives spotted a grey Chevrolet Caprice parked in the vicinity of 1653 Fremont Street in Warren, Ohio, on the afternoon of May 23, 2007.  The detectives considered this to be a high-drug trafficking area.  They noticed a man, later identified as Porter, sitting in the car's passenger seat in a sleeveless T-shirt counting what looked like a large amount of money.  The detectives continued to watch the vehicle and saw another man, later identified as Brian Poole, walk multiple times between the vehicle and one of the Fremont Street houses. Suspecting that a possible drug transaction was in progress, the detectives contacted a canine unit and requested that an officer be ready to proceed to the scene if a traffic stop ensued.  Poole then drove off in the car, with Porter in the passenger seat, and the detectives followed.

The detectives observed the vehicle cross a double yellow line and pass another vehicle in a no-passing zone and pulled Poole over. They approached the stopped car and recognized the drive from previous encounters as Poole.  Poole gave an inconsistent answer when asked about his travel plans.  He was talking fast, appeared nervous, and sweat was dripping from his forehead and down his face.  Porter also appeared nervous and was sweating.

Once the canine officer arrived at the scene, she requested that Poole and Porter exit the car so her dog could conduct a sniff. When Porter exited, a detective commenced a patdown for weapons, during which a plastic baggie fell from Porter's shorts onto the ground.  Inside the baggie were 55.9 grams of crack and125 grams of cocaine.

The government filed a two-count indictment against Porter.  It charged him with intentionally possessing with intent to distribute approximately 55.9 grams of crack in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) and 18 U.S.C. § 2, and intentionally possessing with intent to distribute approximately 125 grams of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and 18  U.S.C. § 2.  Porter filed a motion to suppress the evidence found during the patdown search, arguing that officers lacked any reason to believe that he was armed and dangerous.  After a suppression hearing, the district court entered an oral order denying the motion.  The court concluded that because the officers could constitutionally conduct a canine sniff of the vehicle, and

2

(4:07 CR 473)

order the driver and passenger to exit the vehicle, the subsequent patdown search of Porter also was constitutional.  The district court found that there was no need to determine whether there was reasonable suspicion that Porter was armed and dangerous:

> [T]he court finds it's not necessary to find that there was reasonable belief to believe the passenger was armed and dangerous.  I don't believe that test applies in this case because of the legitimate use of the canine, and then the right of the officers to remove the occupants of the vehicle to complete the canine search and also the right of the officers to protect themselves during such an exercise and without the necessity of finding that the defendant was armed and dangerous.

(Dis. Ct. Doc. No. 41 at 86-87.)

Porter pleaded guilty to both counts, reserving his right to appeal the validity of the patdown search, which he does now.

## II.  The Position of the Parties Upon Remand

The Court scheduled an evidentiary hearing consistent with the remand instructions.  Both the government and the defendant agreed to submit the transcript of the suppression hearing conducted on December 10 and 11, 2007.  The defendant specifically agreed not to offer any additional testimony consistent with his counsel's representation.  Counsel for the government also agreed not to introduce any additional testimony.[1]

---

[1]The government has filed a brief in opposition to the defendant's motion to suppress.  Doc. 70.  The author of the government brief reviews a number of the facts supported by review of the transcript of the initial suppression hearing and concludes with the proposition that the police officers had basis for a reasonable suspicion that the defendant was armed and dangerous.  However, neither of the police officers involved in the stopping of the vehicle and the subsequent frisk of the defendant, resulting in the seizure of the contraband, testified to such a suspicion.  Rather, the government elected not to

3

(4:07 CR 473)

The Court extended to counsel the opportunity to file briefs after the agreement to submit the case on the basis of the December 2007 transcript.

The case has now been briefed and is ready for resolution.

### III.  The Relevant Testimony With Respect to The Canine Search and the Pat-Down of the Defendant

The transcript of the motion to suppress includes 67 pages of testimony and an additional 20 pages of argument.  Officer Weber's testimony relating to the seizure of the crack cocaine and cocaine follows:[2]

Q.      When Officer McMahon -- you asked Brian Poole out of the car?

A.      Yes, sir.

Q.      And what did you do when he stepped out of the car?

A.      He exited the vehicle and patted him down and made sure he didn't have any weapons.

Q.      Why did you pat him down?

A.      To ensure he didn't have any weapons.

Q.      Was he under arrest at that time?

A.      No, sir.

Q.      Why was he asked out of the vehicle?

---

call the officers to inquire about whether they had "a reasonable suspicion" that the defendant was armed and dangerous.

[2]Govt. Exh. 1, p. 28, line 24 through page 31, line 4; p. 31, line 6 through p. 37, line 8.

4

(4:07 CR 473)

A.      Because Officer Ewanish was going to conduct a canine

sniff of the vehicle.

Q.      And after he was patted down, what happened to him?

A.      He was detained and placed over basically on the sidewalk

away from the vehicle.

Q.      Okay.  And was Defendant Porter asked to exit the vehicle

at that time?

A.      Yes.

Q.      Why was he asked to exit the vehicle?

A.      He was also going to be patted down.

Q.      Okay.  And who patted him down?

A.      I did.

Q.      And when he exited the vehicle, what happened?

A.      Basically I asked him to exit the vehicle.  He had his

wallet, I think sunglasses and maybe his cell phone on his lap.

Q.      What happened with those items?

A.      I asked him to place those on the dash.  He did that.  He

exited the vehicle.  I told him put your hands on the vehicle on the

roof of the vehicle, leave them there.  I'm going to pat you down

for weapons.

Q.      And why, again, were you patting him down?

(4:07 CR 473)

A.    To ensure he didn't have any weapons on his person.

Q.    Why was he asked out of the vehicle?

A.    For that same purpose, Officer McMahon was going to

conduct a canine sniff of the vehicle.  She wanted the occupants

out.

Q.    And when you told him to put his hand on top of the

vehicle, what happened?

A.    I started the initial pat-down which my normal routine is

around the waistband area.

Q.    Why was that?

A.    That's a likelihood where anybody would have a gun.

Q.    And when you reached for his waist, what happened?

A.    I reached for his waist area, he removed his right hand from the

roof of the car and immediately put it down by his right pocket.

Q.    What did you do?

A.    I grabbed his wrist at that point.  Detective Gambill who

was standing on his left side grabbed his left wrist.

Q.    Then what happened?

A.    At which time he was going to be handcuffed and detained.

Q.    Was he under arrest at that time?

A.    No sir.

6

(4:07 CR 473)

....

THE COURT:        If he's not under arrest, why
are you handcuffing him?

THE WITNESS:        At that point it was for our
safety.  I had instructed him to keep his hands on
the car.

THE COURT:        You can handcuff anybody
you want to for your safety?  Is that your
testimony?

THE WITNESS:        I'm not going to testify
anybody.

THE COURT:        If he's not under arrest -- so
if he's not under arrest, where do you get the power
to handcuff him?  Well, I am asking him now.  I
want to know what the policy is or what he believes
authorizes him to handcuff a person who's not
under arrest.

THE WITNESS:        I can't cite a policy or case
law if that's what you're asking me.

THE COURT:        You do it because you're
concerned about your safety?

7

(4:07 CR 473)

THE WITNESS:          <u>Correct.</u>

THE COURT:            <u>What did this person do to</u>

<u>you to indicate that your safety was at issue?</u>

THE WITNESS:          <u>Didn't listen.</u>

THE COURT:            What didn't he listen to?

THE WITNESS:          I told him to keep his hands

on the car while I was going to pat him down and as

soon as I went for the waistband area, he brought

his -- quickly brought his arm down to the side.

THE COURT:            Why did you have his hands

up on the roof of the car to begin with?

THE WITNESS:          Because that's a type of

position, you know, you place a person in order to

pat him down.

THE COURT:            Where was the authority to

pat him down?  He wasn't arrested.  Can you pat

anybody down you want to just because you are

concerned about your safety?

THE WITNESS:          I guess it will depend on the

circumstances.

THE COURT:            What circumstance led you to

8

(4:07 CR 473)

believe that your safety was at issue?

THE WITNESS:        Well, at that point, in my

mind that, you know, you got two people here.  I

know that one guy.  I know Mr. Poole from -- I

don't know if I can testify to his past and my history

with him.

THE COURT:          Did you know Porter?

THE WITNESS:        No sir.

THE COURT:          Never met him before?

THE WITNESS:        Never met him before.

THE COURT:          You think he's dangerous

because he's with Poole?

THE WITNESS:        At that point, I don't know.

THE COURT:          Go on.  I am still looking for

authority here.

MR. BROWN:          Yes, Your Honor.

Q.      Was he asked to be removed from the car so a canine

search could be performed?

A.      Yes, they were both advised.

THE COURT:          What give you the right to do

the canine search?  Why did you think it was okay

9

(4:07 CR 473)

to do a canine search?  What had you seen that

prompted you to believe that you could do a canine

search?

THE WITNESS:      It was a canine sniff.

THE COURT:      Wait a minute.  If you stop

me for driving through Warren for going through a

stop sign, you're going to bring the canine in?

THE WITNESS:      No sir.

THE COURT:      Why did you bring it in in

this case?

THE WITNESS:      Well, my observations of

what I observed on Fremont Street.  He was --

THE COURT:      Exiting in and out of the

building?  The counting of the money by the

passenger and the driver going in and out of the

building, is that what made you believe that there

was some criminal conduct afoot involved drugs?

THE WITNESS:      Yes, sir.

THE COURT:      Did you know that house

where they were going in and out of?

THE WITNESS:      No sir, I couldn't see which

(4:07 CR 473)

house --

THE COURT:        You didn't even know if they

went in the same house or not?

THE WITNESS:        That's correct.

THE COURT:        All right.  Go on.  Go ahead

with your questions.

MR. BROWN:        Thank you, Your Honor.

BY MR. BROWN:

Q.        After Mr. Poole or Mr. Porter was handcuffed, what

happened?

A.        I went again to continue with the pat-down, and before I

could touch him again, a plastic baggy fell out from his shorts on

to the ground.

Q.        Did you examine that bag?

A.        Yes, sir.

Q.        What were the contents of that bag?

A.        Crack cocaine and powder cocaine.

Q.        Do you recall the weight of the crack cocaine and the

powder cocaine?

A.        There were over 55 grams of crack cocaine and over 125

grams of powder cocaine.

11

(4:07 CR 473)

Q.      Just to review, what did you observe prior to the traffic stop that aroused your suspicion in this vehicle?

A.      Mr. Porter counting what appeared to be a large sum of money, set up surveillance on that vehicle.  Mr. Poole in and out of the area of a house three times, made a traffic stop for the illegal violation.  Mr. Poole sweating, talking rapidly. It was out of character for him.

THE COURT:          Out of character?  What do you mean out of character?

THE WITNESS:      I've dealt with Mr. Poole on several occasions.

THE COURT:          In what context?

THE WITNESS       Arrests.  I've arrested Mr. Poole.

THE COURT:          In the heat of the summer? In the cold of the winter?  When have you arrested him?

THE WITNESS:      Several times.

THE COURT:          Well, what was the weather like?

THE WITNESS:      I'm not referring to the

12

(4:07 CR 473)

sweating.  I was referring to the way he was

speaking and the way he was acting, his

nervousness.

THE COURT:          I thought you said you were

concerned about his sweating.  You're taking that

out of the equation?

THE WITNESS:          No.  that's part of it also.

THE COURT:          I've seen some record here

that it was 87 degrees that day.  Would you say that

that would be hot?

THE WITNESS:          Yes.

THE COURT:          All right.  Are you telling me

he was sweating abnormally?

THE WITNESS:          It was dripping off his

forehead and down his face.

THE COURT:          All right.  Continue.  I think

we've got the bags of crack cocaine and powder

cocaine that came out of the possession of the -- of

this defendant who has moved to suppress at the

time you had him out of the vehicle and after he

removes his hand from the top of the roof of the car;

13

(4:07 CR 473)

is that right?

MR. DUNCAN:          That's correct.

THE COURT:           That's the discovery of the

cocaine?

MR. DUNCAN:          That's correct.

THE COURT:           Of crack cocaine.


BY MR. DUNCAN:

Q.      Was the canine unit present at that point?

A.      Yes, sir.

Q.      Was the canine unit prepared to begin a sniff of the exterior

of the car?

A.      Yes, sir.

Q.      Do you know if that actually occurred?

A.      It did not.

Q.      And do you know why not?

A.      We had already recovered the substance.

(Emphasis added).

On cross-examination, Weber testified additionally as follows:[3]

Q.      Thank you.  Officer Weber, I would like to pick up at the

_____

[3]Govt's Exh. 1, p. 50 to line 23 through page 54, line 18.

14

(4:07 CR 473)

time when you pulled Mr. Porter out of the vehicle, just to rehash a little bit.  Did you actually remove Mr. Porter from the vehicle?

A.     He stopped out on his own.

Q.     He stopped out on his own?

A.     Correct.

Q.     I believe it was your testimony that you began to pat him down at his waistband?

A.     Correct.

Q.     And then you said that he took one hand down and made a move toward his waistband?

A.     Towards his right pocket.

Q.     And then you said that he took one hand down and made a move toward his waistband?

A.     Towards his right pocket.

Q.     Towards his right pocket.  And at that time, you handcuffed him?

A.     Yes, sir.

Q.     Did you handcuff him in the back or in the front?

A.     In the back.

Q.     In the back.  And then you continued your pat-down, correct?

15

(4:07 CR 473)

A.      I attempted -- prior to me touching him a second time?

That's when the cocaine and crack cocaine fell out of his shorts.

Q.      So is it your testimony that you never touched him after he

was handcuffed and the cocaine spontaneously fell from his

shorts?

A.      Once the cocaine fell from his shorts and I testified to I

took him to the -- Detective Gambill recovered the baggy and I

took him to the back of the car and searched him.

Q.      I want to take you slowly through the cocaine falling to the

ground, okay?

Q.      You handcuffed him in the back, correct?

A.      Yes.

Q.      What was the position of his feet when you handcuffed

him?

A.      Shoulder width apart.

Q.      Shoulder width apart.

            THE COURT:          Say that again.

            THE WITNESS:        It was shoulder width apart.

            THE COURT:          I'm not getting that.  You are

saying shoulder width apart.  His feet were apart?

            THE WITNESS:        Correct.  Proportion to his

16

(4:07 CR 473)

        shoulder.

BY MR. WARNER:

Q.     You were saying his feet were directly underneath his body

at that time?

A.     Approximately.

Q.     His feet were not apart beyond the width of his shoulder?

A.     Not that I could recall.

Q.     Do you recall at any time using your foot to spread his feet

apart?

A.     No sir.

        THE COURT:     You can't recall or you didn't

do it?

        THE WITNESS:    I didn't do it.

BY MR. WARNER:

Q.     You didn't do it?

A.     That's correct.

Q.     Did Mr. Porter make any sort of movement causing the

cocaine to fall?

A.     He moved around when we handcuffed him a little bit, but

        --

Q.     All right.  But to be clear, he was handcuffed and then the

(4:07 CR 473)

cocaine fell to the ground?

A.      That's correct.

Q.      Okay.  He didn't fall while he was being handcuffed.  It fell after he was being handcuffed?

A.      Correct.

Q.      And did he move to cause it to fall?

A.      I'm not sure.

Q.      All right.  But you are sure that you never moved his feet at all?

A.      Not that I can recall.

Q.      All right.  Not that you can remember?

A.      That's correct.

Q.      All right.  So is there a possibility that you moved his feet?

A.      That he -- that I moved his feet?

Q.      Yes.

A.      No.  I never moved his feet.

Q.      Was -- was you -- was the Expedition equipped with a video camera at all?

A.      No sir.

Q.      Did any -- did Officer Gambill witness the cocaine falling to the ground?

18

(4:07 CR 473)

  A. Yes, sir.

  Q. She did?

  A. Yes sir.

  Q. Where was she positioned?

  A. She was positioned on his left side.

(Emphasis added).

 Officer Sherry McMahon, the Warren Police Department Canine Officer, testified as follows:[4]

  Q. What is your procedure for performing the canine sniff?

  A. On vehicles?

  Q. Yes, on vehicles.

  A. I ask that the occupants exit the vehicle.

  A. And let me stop you right there.  Why do you ask occupants to exit the vehicle?

  A. I have several reason why I do that.  First I need to pay attention to what -- how the dog reacts, what the dog is doing.  I don't need to worry about what the occupants in the vehicle are doing.  So for my safety, not having to worry about the occupants in the vehicle and paying attention to the dog, I need to have them exit the vehicle.

_____

[4]Govt's Exh. 1 page 62, line 15 through p. 64, line 2.

(4:07 CR 473)

A.      Okay.

A.      First reason.  Second reason, when I first began in the

canine unit, I had a driver put the car in drive while I was search --

sniffing the exterior of the vehicle and almost run me over, so for

those two reasons, for my safety, I have them exit the vehicle.

Q.      Okay.  And, in fact, in this case, did you or were the

passenger and driver removed from the vehicle?

A.      Yes.

Q.      And when a passenger and -- or when people are taken out

of a vehicle or leave a vehicle, are there any further steps taken in

relation to them for officer safety?

        THE COURT:          Were you talking generally

        or in the this case?  I'm not interested in general.

BY MR. DUNCAN:

Q.      In this case, were any other steps taken to aid you in your

search?

A.      By me?

Q.      Or by anybody you're able to observe at the scene.

A.      Detective Weber and Detective Gambill; Terry patted the

occupants down.

A.      Okay.  Do you know why they did that?

20

(4:07 CR 473)

   A. For weapons.

   Q. Is that for officer safety?

   A. Yes.

(Emphasis added).

The Court's Conclusion and Ruling

At the time the court conducted the suppression hearing in 2007, the pronouncement of the Supreme Court in *Arizona v. Johnson, supra*, was more than a year in the future.  The Court was of the mistaken belief that if a reasonable basis to submit a motor vehicle to a canine search existed, the law enforcement officers requesting the canine search were entitled to remove the occupants from the vehicle and engage in a protective frisk of the occupants of the vehicle in the context of their concern for their safety without regard to whether they had a reasonable suspicion that the occupants of the vehicle, passengers and driver, were armed and dangerous.  It seemed obvious to the Court that the removal of the occupants of the vehicle to accommodate the canine sniff was reasonable.

After reviewing the transcript of the evidentiary hearing conducted in December of 2007, it appears obvious that the police officers removed the defendant, a passenger in the vehicle, to accommodate the canine sniff and engaged in a frisk of the defendant-passenger, not because of a "reasonable suspicion that the defendant was armed and dangerous," but rather as an exercise in sound police practices for their own safety because of the possibility that the unknown passenger might be armed.  However, as this Court reads the directions contained in *Arizona v. Johnson,* a police frisk of a passenger removed from a vehicle in order to accommodate a canine

21

(4:07 CR 473)

sniff for controlled substances for practical safety reasons does not equate with a "reasonable suspicion that the passenger, i.e. the defendant, unknown to the frisking officer, was armed and dangerous."

Consequently, the defendant's motion to suppress the fruits of the attempted frisk, i.e. the crack cocaine and the powder cocaine is GRANTED.

(4:07 CR 473)

      The Court schedules a status call for the 8th day of July, 2010 at 1:00 p.m. to schedule this case for trial.


      IT IS SO ORDERED.


  July 1, 2010                            */s/ David D. Dowd, Jr.*
Date                                     David D. Dowd, Jr.
                                          U.S. District Judge